# Exhibit I

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civ. No. 1:20-cv-3729

MICHELE M. BANKS and
KEVIN BANKS,

    Plaintiffs,

v.

MUHAMMAD MUNIR, M.D.,

    Defendant.

**SWORN DECLARATION OF MICHAEL LOBATZ, M.D.**

1. My name is Michael Lobatz, M.D. I am over the age of eighteen and competent to make this affidavit. I make this affidavit based on personal knowledge.

**Qualifications**

2. As set forth in my CV and discussed in my depositions, I am a board-certified physician specializing in neurology and have been in practice for over 40 years. I studied biomedical engineering as an undergraduate at the University of Illinois, and then entered the University of Illinois' neuropharmacology program. After four years in that program, I enrolled in medical school at the University of Illinois and received my MD in 1977. My post-doctorate training began that year at the University of California San Diego where I completed an internship and a residency in neurology and served as the chief resident in 1981. I have continuously practiced medicine in the specialty of neurology from 1981 to the present. I have taught at the Veterans Affairs Medical Center in La Jolla, the Naval Medical Center San Diego, and at the University of California San Diego. My teaching has been focused on neurology.

3. I have been involved in research regarding the efficacy of various treatments of patients with ischemic strokes. I was one of the clinical sub-investigators in the clinical trial conducted by the National Institute of Neurologic Disorders and Stroke (NINDS), which was one of the seminal clinical trials leading to the current widespread use of tissue plasminogen activator (tPA) for the treatment of patients presenting in the first few hours after the onset of stroke symptoms. For the last four decades, I have devoted my clinical medical practice to the care of patients with neurologic disorders including stroke and traumatic brain injury. This includes over a thousand stroke patients. My experience caring for stroke patients began before the widespread use of tPA and has continued for the last 25 years after tPA approval by the Food and Drug Administration. During my career as a neurologist at a tertiary care and comprehensive stroke center that tPA became the primary and mainstream treatment for patients who suffer an acute stroke and present to the emergency department within the first few hours after the onset of symptoms. Not only did I treat hundreds of stroke patients with tPA, but throughout my career I regularly followed patients for many years, through the rehabilitation process, having been the Medical Director of Scripps Rehabilitation Center for more than twenty years, and continue to follow many of those patients today.

**Methodology Employed in This Case**

4. I employed the same methodology in assessing Ms. Banks' case that I have used in the treatment of patients for the last four decades. That methodology is referred to as evidence-based medicine ("EBM"). Evidence-based medicine is the use of the best available modern medical knowledge, together with known information about an individual patient, to make treatment decisions which will have the most beneficial outcome for a patient. The EBM methodology combines what has been demonstrated through clinical studies of the effects of various medical

2

treatments and the application of the evidence from those studies to the circumstances of an individual patient. Evidence-based medicine is employed by nearly all physicians trained in the last several decades and is considered the gold standard for determining which medical treatments will be used and determining the likelihood that a specific medical treatment will be effective, which is necessary before explaining the likely risks and benefits of such treatment to a patient.

**Stroke and Treatment of Stroke**

5.       Stroke is a neurologic disease in which tissue in the brain or spinal cord is deprived of the normal flow of blood, producing cell death and related neurologic dysfunction. The most common type of stroke is an ischemic stroke, whereby the blood flow to neurologic tissue is obstructed by some form of an occlusion. It has been universally accepted within the field of neurology that rapid restoration of blood flow following the onset of ischemic stroke is the best way to minimize the impact of stroke and to enable patients to maximize their functional independence and neurologic capabilities. tPA helps accomplish this outcome because it is a clot busting drug.

6.       Stroke clinicians and researchers use various metrics to measure the impact of a stroke on a patient's ability to function. One of the most common metrics is known as the modified Rankin Scale. The modified Rankin Scale (mRS) is a scale from zero to six, which identifies the degree of an individual patient's impairment as follows:

| Rating | Degree of Impairment Description |
|---|---|
| 0 | No symptoms at all |
| 1 | No significant disability: despite symptoms, able to carry out all usual duties and activities |
| 2 | Slight disability: unable to perform all previous activities but able to look after own affairs without assistance |
| 3 | Moderate disability: requiring some help but able to walk without assistance |
| 4 | Moderately severe disability: unable to walk without assistance and unable to attend to own bodily needs without assistance |
| 5 | Severe disability: bedridden, incontinent and requiring constant nursing care and attention |

| 6 | Death |
|---|-------|

7.      Medical science has developed a body of evidence demonstrating that many patients have improved functional outcomes, i.e. lower modified Rankin Scale scores, when their strokes are treated with tPA and/or thrombectomy or other catheter-based approaches immediately after the onset of symptoms.

8.      There is a robust body of knowledge establishing the efficacy of tPA for patients with ischemic strokes. As indicated above, I was personally involved as an investigator in the initial trials which established the efficacy of this treatment. While there is room for debate as to exactly what percentage of patients have their recovery improved as a result of the administration of tPA, among patients in the NINDS study who received the medication within the first three hours after the onset of stroke symptoms, approximately 39% of patients had a modified Rankin Score of 0-1, compared with only 26% who did not receive tPA.  In addition, it is well known and widely accepted in neurology that certain subgroups of patients improve with tPA more than others.

8.      For example, factors such as duration of time between onset of symptoms and administration of the medication, whether there is collateral circulation to the affected area, and age of the patient also affect success of therapy.  It is widely accepted in stroke treatment that patients who receive treatment more quickly after the onset of stroke symptoms have better outcomes.  This had led to the near-universal statement in stroke treatment that "Time is brain." Similarly, those who receive treatment while the neurologic tissue is affected, but not yet irreversibly damaged, stand the greatest chance of improving when tPA is given and assists in reestablishing blood flow.   This phenomenon -- whereby an area of neurologic tissue is adversely affected by lack of blood flow but not irreversibly harmed -- is referred to as the ischemic

4

penumbra. The availability of collateral circulation allows the tissue perfused by the blocked blood vessel to remain viable temporarily (albeit impaired) and then recover after sufficient blood flow is restored with administration of tPA.

**Application of Evidence-Based Medicine to Michele Banks' Stroke**

10. In this case, using the principles of evidence-based medicine, I began by assessing the known scientific evidence regarding the effectiveness of tPA in patients like Michele Banks. To do that, as cited in my report, I reviewed a body of medical literature on stroke generally. As summarized in my 83-page report, I reviewed Ms. Banks' medical records from before the stroke, during the stroke, and after the stroke in detail. I've reviewed the medical imaging of Ms. Banks' brain and the reports of neuroradiologist, Dr. John Barr who opines that Ms. Banks suffered a small vessel occlusion in a branch of the distal left anterior cerebral artery ("ACA"). These materials provided me with the information that neurologists treating patients like Ms. Banks would normally rely on to determine what treatments would likely have been effective to improve the outcome from this patient. Several factors lead me to conclude that Ms. Banks' stroke was highly amenable to successful treatment with tPA.

11. The fact that Ms. Banks presented for treatment within three hours after the onset of symptoms increases the likelihood that tPA would have been successful. Ms. Banks presented to the Penrose St. Francis Hospital, within two and a half hours of her last known normal. Her consultation with Dr. Munir began roughly two hours and forty-five minutes after her last known normal. tPA could have been administered close to the three-hour window from her last known normal and well within the four- and half-hour window. Moreover, the fact that Ms. Banks made a rather significant improvement, even without tPA, is an indication that Ms. Banks had collateral circulation, which did in fact allow tissue in the affected area to remain viable. This demonstrates

that the decrease in blood flow to the affected part of her brain did not affect the tissue all at once, but rather had an evolving course which demonstrates that the penumbra phenomenon was likely occurring and that this patient's brain tissue could have been salvaged with prompt restoration of blood flow.  Ms. Banks' young age, of only 45 at the time of the stroke, also makes her a strong candidate to do well with tPA.  Patients in this age bracket are not well studied in the literature because they do not often suffer from strokes.  But based on my extensive experience, these patients have better outcomes than the geriatric populations typically studied.  Finally, the fact that Ms. Banks' stroke was the product of a small vessel occlusion supports my opinion that Ms. Banks was more likely to benefit from tPA. As set forth on page 82 of my report, it is well settled that small vessel occlusions in a patient with Ms. Banks medical history and demographics respond better to tPA.  Of note, in the NINDS study, more than 50% of the patients with small vessel occlusions who were given tPA had a favorable outcome.  On the Modified Rankin Scale, 63% of these patients had a favorable outcome. Additionally, the most recent study published on February 9, 2023 in The Lancet, a prestigious medical journal, reported that 59% of patients treated with alteplase (tPA) achieved a mRS scores of 0-1 at 90 days (no symptoms to no significant disability) and 72% had mRS scores of 0-2 (no symptoms to slight disability). (www.thelancet.com Published online February 9, 2023 https://doi.org/10.1016/S0140-6736(22)02600-9)

12. Based on a combination of these individualized patient-specific factors, together with the known brain-saving effect of prompt administration of tPA, it is my opinion to a reasonable degree of medical certainty that administration of tPA would have significantly, more likely than not, lessened the degree of neurologic damage and allowed her to function independently with an improved Modified Rankin Score.  I have treated hundreds of patients with tPA and, in my experience, patients who present like Ms. Banks are very likely to experience a good recovery with

timely administration of this effective treatment. Importantly, my experience in following patients from the neurorehabilitation standpoint well beyond the 90 day windows of time most studies reference, would support better outcomes as well.

13. I disagree with the position that my opinion regarding effectiveness of treatment cannot be established unless that treatment has been demonstrated to work in all patients more than 50% of the time. While data from all patients has value in deciding whether treatments should be given, such data have only limited value whether when determining the likely degree of success in a particular patient — in this case, a young patient with a small vessel occlusion and evidence of good collateral flow. Specifically, in the case of stroke, the vast majority of patients included in randomized trials were significantly older than Ms. Banks. For example, the mean age of patients studied in the NINDS trial was 67 (+/- 10 years).

14. I also disagree with the position that the effectiveness of tPA in younger patients cannot be established because there are no placebo-controlled trials focused on this patient group. It became impossible to conduct such trials after it was established in the mid-1990s that tPA was effective, because a medical provider could not withhold tPA from stroke patients in order to compare their outcomes to those who receive treatment. Once the effectiveness of a treatment is established, it is unethical to continuing studying the treatment in that manner. Notwithstanding the absence of placebo-controlled trials in young patients with strokes, these patients are routinely given tPA because medical science knows from experience that it is very effective.

STATE OF ~~CALIFORNIA~~ Texas  ) 
) ss.    02/24/2023
COUNTY OF ~~SAN DIEGO~~ Rockwall )

I, Michael Lobatz, M.D., being first duly sworn, state that I have read the above, know the contents thereof and that the statements contained therein are true.

7

Signer(s): Michael Lobatz, produced: California Driver License, as identification along with multi-factor KBA authentication, and audio/video recording to be notarized online in the County of Rockwall, State of Texas, USA.

_____
Michael Lobatz, M.D.

Subscribed in my presence and sworn to before me this 24th day of February 2023.

_____
Notary Public

My Commission Expires: __May 12, 2024__

SONIA PLATZ
Notary ID #11048993
My Commission Expires
May 12, 2024

8