IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:20-cv-03729-CNS-MDB

MICHELE M. BANKS and KEVIN BANKS,

      Plaintiffs,

v.

MUHAMMAD MUNIR, M.D.,

      Defendant.

---

## ORDER

---

Before the Court are Defendant Muhammad Munir, M.D.'s Motion to Exclude Plaintiffs Michele M. Banks and Kevin Banks's Expert Causation Opinions and Defendant Munir's Motion for Summary Judgment (ECF Nos. 61 and 62). For the following reasons, the Court DENIES Dr. Munir's Motions.

## I. BACKGROUND

Plaintiffs filed this lawsuit in December 2020, bringing claims for medical negligence and loss of spousal consortium against Dr. Munir based on his alleged failure to provide Ms. Banks with adequate medical treatment related to a stroke that she suffered in January 2019 (*see* ECF No. 1). Plaintiffs allege that Ms. Banks was a candidate for intravenous tissue plasminogen activator treatment, or "tPA," but that Dr. Munir "recommended against" its administration (*id.* at 3 ¶ 26–

27).[1] "Timely administration" of tPA would have "mitigated" or "improved the outcome" of Ms. Banks's stroke (*id.* at 4 ¶ 33–34).

Dr. Lobatz opined that—had tPA been administered—it was more likely than not that Ms. Banks would have had an improved and more favorable outcome following her stroke, or possibly returned to "normal" (*see* ECF Nos. 61-1 at 6–7; 61-3 at 82). Dr. Lobatz, a neurologist with over forty years of neurology and neuro-rehabilitation experience, examined Ms. Banks in forming this opinion, as well as reviewed her medical records and relevant scientific literature (*see, e.g.,* ECF No. 61-3 at 80). According to Dr. Lobatz, he has administered tPA "hundreds of times" over these forty years, and is familiar with the scientific literature related to tPA's efficacy (ECF No. 74-10 at 3, 11–12, 15). He further testified that no published medical literature exists demonstrating that the "absolute probability of benefit" for a tPA recipient is fifty percent or greater, as well as that there is no "good data" in the scientific literature regarding tPA's efficacy "in the young population because strokes don't happen to this patient population as often as they do in [the] geriatric population" (*id.* at 7, 15; *see also* 61-1 at 6).

In January 2021, Dr. Munir moved to dismiss Plaintiffs' negligence claim to the extent it was premised on an "alternative 'loss of chance'" causation theory (ECF No. 16 at 1). The Court granted Dr. Munir's dismissal motion, concluding that Plaintiffs could not premise their negligence claim on a "loss-of-chance theory" (ECF No. 30 at 7, 9). After engaging in pretrial discovery, the parties ultimately filed several motions to exclude and the instant summary

---

[1] Plaintiffs' expert, Michael Lobatz, M.D, testified that tPA is commonly called a "clot buster" (ECF No. 74-10 at 5). *See also Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 25 (1st Cir. 2012) ("The drug is a form of thrombolytic therapy that works by dissolving clots that are occluding arteries.").

judgment motion (*see, e.g.,* ECF Nos. 57–58, 60–62). The motions are fully briefed.[2] The Final

Pretrial Conference is set for April 27, 2023.

## II. ANALYSIS

Having considered Dr. Munir's motions, related briefing, and the relevant legal authority,

the Court denies Dr. Munir's motions. The Court considers Dr. Munir's motions in turn, beginning

with the exclusion motion.

### A.  Motion to Exclude

Dr. Munir moves to exclude the causation opinions of Plaintiffs' expert Michael Lobatz,

M.D., on the grounds that Dr. Lobatz's causation opinions are based on an unreliable methodology,

untested experience, and that his opinions are irrelevant and unhelpful (*see* ECF No. 61). After

setting forth the governing legal standard for Dr. Munir's exclusion motion, the Court considers

and rejects these arguments in turn.

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 590–91

(1993). The party submitting the expert's testimony must show by a preponderance of the evidence

---

[2] Dr. Munir states that an evidentiary hearing is "unnecessary," and Plaintiffs agree (ECF Nos. 61 at 76 n.1, 74 at 2).
For this reason, the Court declines to hold a hearing on Dr. Munir's exclusion motion. *See United States v. Nacchio*,
555 F.3d 1234, 1251 (10th Cir. 2009) (en banc) ("If [a party] desired an evidentiary hearing, he bore the burden of
requesting one . . . . Tenth Circuit case law does not mandate that a hearing be held.").

that the testimony is admissible. *See, e.g.*, *Nacchio*, 555 F.3d at 1241. In assessing the admissibility of expert testimony, courts consider the expert's qualifications, the reliability of the expert's opinions, and the opinions' relevance. *See id.* ("Under Rule 702, the district court must satisfy itself that the proposed expert testimony is both reliable and relevant . . . . [and] the district court generally must first determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion." (quotations omitted)); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Doubts about the testimony's usefulness should generally be resolved in favor of admissibility. *See Robinson v. Missouri Pac. R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994) (citation omitted).

> ### 1.  Reliability

Dr. Munir argues that, considering several nonexclusive factors, Dr. Lobatz's causation opinions regarding tPA's efficacy are unreliable (ECF No. 61 at 14).[3] Plaintiffs urge admission of Dr. Lobatz's causation opinions, contending that his opinions are "not rendered unreliable by the data cited by" Dr. Munir in his exclusion motion and assert that caselaw supports the admission of Dr. Lobatz's opinions (ECF No. 74 at 17; *see also id.* at 12–17). The Court agrees with Plaintiffs.

A court may consider several nonexclusive factors in assessing the reliability of an expert's opinion:

> (1) whether the theory at issue can be and has been tested;
>
> (2) whether the theory has been subjected to peer review and publication;
>
> (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and

---

[3] Dr. Munir does not argue that Dr. Lobatz is unqualified to render his opinions.

> (4) whether the theory has been accepted in the relevant scientific community.

*United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (citing *Daubert*, 509 U.S. at 593–94); *see also 103 Invs. I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). The reliability inquiry is "flexible," and these "specific factors neither necessarily nor exclusively appl[y] to all experts or in every case." *Wells v. Kawasaki Motors Corp., U.S.A.*, 854 F. App'x 242, 246 (10th Cir. 2021) (citing *Kumho Tire*, 526 U.S. at 141). Fundamentally, the "reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case." *Roe v. FCA US LLC*, 42 F.4th 1175, 1181 (10th Cir. 2022) (citing *Kumho Tire*, 526 U.S. at 152); *see also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014) ("Reliability is primarily a question of the validity of the methodology employed by an expert . . . ." (quotations omitted)). "Accordingly, a district court must admit expert testimony as long as it is based on a reliable methodology. It is then for the jury to evaluate the reliability of the underlying data, assumptions, and conclusions." *In re Urethane*, 768 F.3d at 1263 (citation omitted).

**Testing & tPA's Efficacy.** Dr. Munir contends that tPA's efficacy has been "tested for over two decades," and that this testing demonstrates that its efficacy is "less than" fifty percent and that "patient age does not change tPA's efficacy" (ECF No. 61 at 14–15). Dr. Munir asserts that Dr. Lobatz's opinions that Ms. Banks would have "more likely than not" enjoyed a more favorable outcome had tPA been administered should be excluded because this testing and several studies—including the 1995 National Institute of Neurologic Disorders and Stroke (NINDS) study, the "Subgroup Analysis of the NINDS t-PA Stroke Trial," and the 2008 "Thrombolysis with Alteplase 3 to 4.5 Hours after Acute Ischemic Stroke" European Cooperative Acute Stroke  Study (ECASS

III study)—contradict Dr. Lobatz's "untested opinions" regarding tPA's efficacy, and render them unreliable (*id.* at 15; *see also* ECF Nos. 61-4, 61-6, 61-7). Plaintiffs argue these testing data and studies do not render Dr. Lobatz's opinions unreliable (ECF No. 74 at 17). The Court agrees. Dr. Lobatz testified:

> We don't have good data on this and it's largely absent in the literature for this young age because strokes don't happen to this patient population as often as they do in geriatric population.

(ECF No. 74-10 at 7). As Plaintiffs argue, the data and tests that Dr. Munir cites do not wholly contradict Dr. Lobatz's opinions. For instance, the NINDS study states that the percentage of "small-vessel occlusive" patients who experienced a "favorable outcome" with t-PA exceeded fifty percent (ECF No. 61-4 at 5). So too with the ECASS III study (*see* ECF No. 61-7 at 6, 11).[4]

Fundamentally, in assessing the reliability of Dr. Lobatz's opinions under this nonexclusive *Daubert* factor, the Court is tasked with determining whether Dr. Lobatz's theories "can and ha[ve] been tested." *Rodriguez-Felix*, 450 F.3d at 1123. The parties' submissions amply demonstrate that theories regarding tPA's efficacy have been tested over decades in the relevant scientific communities. To the extent that Dr. Munir argues that tests and data from other studies, such as the NINDS or ECASS III studies, regarding tPA's efficacy contradict or undermine Dr.

---

[4] The parties dispute the extent to which various scientific studies undermine or support Dr. Lobatz's opinions. For instance, Dr. Munir argues that the NINDS study—contrary to Dr. Lobatz's opinion regarding the availability of data on tPA's efficacy in younger populations—"us[ed] a patient population of 18 to 80 years old" (ECF No. 61 at 15). Dr. Munir further argues that the scientific literature regarding tPA's efficacy does not show that the "absolute probability of benefit for" a tPA recipient exceeds fifty percent (ECF No. 61 at 11–12). These arguments mirror those the First Circuit confronted in *Samaan. See, e.g.,* 670 F.3d at 33–34. However—as discussed further below—at this stage in its reliability assessment, the Court is concerned with whether the theories regarding tPA's efficacy can and have been tested. *Rodriguez-Felix*, 450 F.3d at 1123. Further, Dr. Munir's arguments fail to persuade that Dr. Lobatz "ignored or discounted without explanation" any arguably contrary findings in the scientific literature (*cf.* ECF No. 61-1 at 17). *See also Norris*, 397 F.3d at 886; *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) ("While expert opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . .  absolute certainty is not required." (citation omitted)).

Lobatz's opinions, he can sufficiently cross-examine Dr. Lobatz to show any weaknesses in his methods and analysis. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking . . . admissible evidence.").

*Peer Review.* Dr. Munir argues that peer review scrutiny of tPA's efficacy demonstrates that it is less than fifty percent, and therefore—for substantially the same reasons that testing regarding tPA's efficacy compels exclusion of Dr. Lobatz's opinions—so too does this peer review scrutiny (ECF No. 61 at 16). The Court rejects Dr. Munir's argument. The fact that Dr. Lobatz's specific opinion regarding Ms. Banks, a relatively younger stroke patient, in this case has not been subjected to peer review does not render it unreliable, especially where the underlying tPA data that Dr. Lobatz has used in forming his opinion has been subject to peer review for decades (ECF No. 61-1 at 17). *See also Kumho Tire*, 526 U.S. at 151 ("It might not be surprising in a *particular case*, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist." (emphasis added)); *cf. Rodriguez-Felix*, 450 F.3d at 1126 ("[O]ther than generalized assertions . . . the report fails to sufficiently reference specific and recognized scientific research, which underlies [the expert's] conclusions, such that the court could determine if this *foundational research had been subjected to peer review*, and, if so, whether it had been accepted in the community." (emphasis added)); *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 24 (1st Cir. 2011) ("The absence of peer-reviewed epidemiological studies does not . . . make it 'almost impossible' for [an expert's] opinion to be admissible."). Moreover, Dr. Munir's arguments regarding peer review of previous tPA studies and data are best suited for cross-

examination of Dr. Lobatz, and Dr. Munir is free to cross-examine Dr. Lobatz regarding the same. *See Daubert*, 509 U.S. at 596.

*Standards and Guidelines for tPA Administration.* Focusing on Dr. Lobatz's deposition testimony, Dr. Munir argues that Dr. Lobatz's opinions are "unreliable under this [*Daubert*] factor" because Dr. Lobatz "failed to identify any standards or guidelines that supported his causation opinions," despite the publication of several guidelines by scientific organizations regarding tPA's administration (ECF No. 61 at 16). The Court disagrees that Dr. Lobatz's opinions are unreliable for this reason. Dr. Lobatz testified that it was "more likely than not" that Ms. Banks "would have been much better than she is now and possibly even normal" had tPA been administered, based on his own experience of administering tPA "many, many times" and using the comparative benefit of tPA's administration "in the geriatric population" (ECF No. 61-1 at 6–7). His failure to discuss any explicit scientific standards or guidelines in offering his testimony does not render the opinions unreliable, given the other indicia of reliability his opinions bear. *See, e.g., Roe*, 42 F.4th at 1180; *Dodge*, 328 F.3d at 1222. And notably, in Dr. Lobatz's expert report, he *does* discuss the "American Heart Association and American Stroke Association guidelines," opining that these guidelines "support the use of [tPA] in [Ms. Banks's] case and should have been followed" (ECF No. 61-3 at 82).

*Acceptance in Scientific Community.* Dr. Munir argues that there is "widespread acceptance for tPA's less-than-50% efficacy," and "no acceptance" for Dr. Lobatz's "contrary opinions," citing several cases in support of this proposition (ECF No. 61 at 17). Plaintiffs contend that scientific studies support Dr. Lobatz's opinion that patients with "small vessel occlusions, like Ms. Banks, are more likely to have a favorable outcome with tPA than those with large vessel

occlusions," and that the caselaw on which Dr. Munir relies is distinguishable (ECF No. 74 at 15–17). The Court agrees with Plaintiffs.

First, Plaintiffs are correct that Dr. Lobatz's opinions are not wholly contradicted by the scientific literature. As discussed above, both the NINDs and ECASS III studies demonstrate that the percentage of small-vessel occlusive patients who experienced a favorable tPA outcome exceeded fifty percent (ECF Nos. 61-4 at 5; 61-7 at 6, 11).[5] Accordingly, the Court disagrees with Dr. Munir that there is "absolutely no acceptance" of Dr. Lobatz's opinions in the scientific literature (ECF No. 61 at 17). *Cf. Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) ("The plaintiff need not prove that the expert is *undisputably* correct or that the expert's theory is 'generally accepted' in the scientific community." (citation omitted)).

Second, Dr. Munir cites a trio of cases from the First, Fifth, and Eighth Circuits that have "rejected similar opinions" to Dr. Lobatz's (ECF No. 61 at 17). Crucial nuances distinguish these cases. The Court discusses these cases—and nuances—in turn.

*Samaan v. St. Joseph Hospital:* In affirming the exclusion of an expert's testimony that a plaintiff's "condition likely would have improved had t-PA been administered," the First Circuit "refined to bare essence" the expert's flawed analyses of "odds ratios" and "absolute efficacy rates." *Samaan*, 670 F.3d at 32–33. "[O]dds ratios are . . . ratios of the odds of an adverse outcome, which reflect the *relative* likelihood of a particular result." *Id.* at 33. The expert's reasoning that

---

[5] The Court notes again the parties' competing interpretations of these and other studies, and their findings regarding tPA's efficacy, and whether the nature of the studies' efficacy findings are relative or absolute (*compare* ECF No. 61 at 12 *and* ECF No. 82 at 5–8, *with* ECF No. 74 at 8). Resolution of these interpretations is better suited, as Plaintiffs contend, for examination and cross examination of Dr. Lobatz, regardless of how many studies Dr. Munir contends contradict Dr. Lobatz's opinions (ECF Nos. 74 at 17, 82 at 4–5). *See also Daubert*, 509 U.S. at 596. This is especially the case where, as here, and in contrast to *Samaan*, Dr. Lobatz's opinions were not based solely on quantitative efficacy data, but also his extensive professional experience (*see* ECF No. 61-1 at 16–17).

the "odds ratios drawn from the [scientific] literature" demonstrated that a patient in the group treated with tPA "increased by over 50%" was "structurally unsound," the First Circuit reasoned, because when "a person's chances of a better outcome are 50% greater with treatment (relative to the chances of those who were not treated), that is not the same as a person having a greater than 50% chance of experiencing the better outcome with treatment." *Id.* According to the First Circuit: "[W]hile the odds ratio analysis shows that a t-PA patient may have a better chance of recovering than he otherwise would have had without t-PA, such an analysis does not show that a person has a better than even chance of avoiding injury if the drug is administered." *Id.* at 34. And as for the expert's analysis of efficacy rates, "[a]lthough certain of the efficacy rates in the NINDS study and/or the ECASS–III Study break a 50% barrier, the question remain[ed]: '50% of what?' Looking at those rates in a vacuum ignore[ed] the substantial number of stroke patients who would improve anyway (that is, without receiving t-PA)." *Id.*

As Plaintiffs contend, Dr. Lobatz's opinions do not suffer the structural deficits the First Circuit identified in *Samaan* (ECF No. 74 at 16). For instance, Dr. Lobatz is not marshalling odds ratios in the same manner as *Samaan*'s expert. Here, Dr. Lobatz used data available for tPA's efficacy in the "geriatric population" from the NINDS study—where "there would be about a one-third benefit"—in opining that, given Ms. Banks's relative youth, co-morbidities, and his experience, it was "more likely than not that [tPA would] be beneficial to her," meaning that Ms. Banks faced a greater than fifty percent probability of "[getting] better and possibly normal" (ECF No. 61-1 at 6–7; *see also* ECF No. 74-10 at 9). The deductive nature of Dr. Lobatz's opinion is underscored by the "large[] absence in the literature" of data regarding odds ratios and tPA's efficacy for "young[er] age" patients, because as Dr. Lobatz testified "strokes don't happen to this

patient population as often as they do in [the] geriatric population" (ECF No. 74-10 at 7). *See also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997) ("Trained experts commonly extrapolate from existing data."). Contrast *Samaan*, where the expert's "odds ratio" analysis *depended* upon . . . . some of the odds ratios [that] exceeded 1.5," from which the expert sought to testify that "the chances of a patient in the *treated group* recovering increased by over 50%." *Samaan*, 670 F.3d at 33 (emphasis added). Moreover, absent from *Samaan* is a discussion of its expert's experience in assessing the admissibility of his opinions. Distinguishably, Dr. Lobatz's opinions are informed by his decades of professional experience—which, as discussed further below, form a valid basis for his causation opinions (ECF No. 61-1 at 16). *See also Nacchio*, 555 F.3d at 1258. In sum, the Court disagrees that—based on the evidence from which Dr. Lobatz has formed his opinion—"the *unavoidable* conclusion . . . is that only a small number of patients overall . . . experience improvement when t-PA is administered." *Id.* at 34 (emphasis added). So too with *Samaan*'s criticism of its expert's distinguishable "reliance on efficacy rates." *Id.*

*Young v. Memorial Hermann Hospital System:* Plaintiffs contend that *Young* is inapposite because the causation standard applied there differs from the one under which Dr. Lobatz's opinions should be assessed (ECF No. 74 at 16). The Court agrees. In assessing causation evidence regarding tPA's administration, the Fifth Circuit applied Texas substantive law, establishing "the standard of causation as 'more-likely-than-not,' which means that it is more probable, i.e. more than 50% likely, that the alleged wrongful conduct caused the injury than not." *Young v. Mem'l Hermann Hosp. Sys.*, 573 F.3d 233, 236 (5th Cir. 2009) (per curiam). However, the Fifth Circuit made clear that "[t]he requirement of a more than 50% probability means that epidemiological evidence *must show* that the risk of an injury or condition in the exposed population was more *than*

*double the risk* in the unexposed or control population." *Id.* (quotations omitted) (emphasis added)); *see also Bustamante v. Ponte*, 529 S.W.3d 447, 469 (Tex. 2017) ("*Young* relied on [the] doubling of the risk requirement."). As a result, the *Young* court affirmed summary judgment, finding that "[t]he failure to treat with t-PA did not result in a more than doubling of the risk of an unfavorable outcome." *Id.* Notably, this causation standard differs materially from the one applicable here. *Compare id., with Lorenzen v. Pinnacol Assurance*, 457 P.3d 100, 105 (Colo. App. 2019). Moreover, Dr. Munir concedes that the causation standard at issue in this case differs from the one applied in *Young. See* ECF No. 82 at 1 ("To establish causation at trial, Plaintiffs have to prove that [Ms. Banks] had 'a greater than 50% chance of experiencing the better outcome with treatment.'" (quoting *Samaan*, 670 F.3d at 33) (emphasis removed)). Accordingly, the Court finds *Young*'s reasoning unpersuasive and rejects it.

*Smith v. Buback:* Plaintiffs argue *Smith* is distinguishable for substantially the same reasons as *Samaan*, chiefly that—although concluding that the plaintiff "offered no expert evidence or explanation showing how [a] purely relative finding of tPA's effectiveness could be used to estimate whether giving tPA to a stroke patient would more likely than not cause the patient to improve"—*Smith* does not foreclose Plaintiffs' ability to demonstrate causation by "other means" (ECF No. 74 at 16). The Court agrees. Central to *Smith*'s reasoning—and conclusion—was its expert's use of the "Review of Tissue Plasminogen Activator, Ischemic Stroke, and Potential Legal Issue" study, which found only that "stroke patients receiving tPA are 57.3% more likely to improve than stroke patients" who did not. *Smith v. Buback*, 643 F.3d 1137, 1142 (8th Cir. 2011). Detrimentally, the Eighth Circuit reasoned, "this result d[id] not reveal whether giving a patient tPA w[ould] more likely than not cause a stroke patient to improve, which is the material inquiry

under [the governing] caus[ation] regime." *Id.* But *Smith*'s analysis was limited to its expert's reliance on this study. *Id.* at 1140; *see also id.* (affirming exclusion of expert evidence because "a *purely relative finding* of tPA's effectiveness" did not show how tPA would "more likely than not cause the patient to improve" (emphasis added)). Accordingly, the Court rejects Dr. Munir's contention that *Smith*—like *Samaan* or *Young*—renders Dr. Lobatz's opinions unreliable.

* * *

In assessing the reliability of Dr. Lobatz's opinions and the evidence, the Court's duty is clear: "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Hoffman v. Ford Motor Co*., 493 F. App'x 962, 974–75 (10th Cir. 2012). Identifying *Daubert*'s four nonexclusive factors, Dr. Munir contends that under each Dr. Lobatz's opinions are unreliable (*see* ECF No. 61 at 14). For the reasons set forth above, the Court disagrees. The scientific literature regarding tPA's efficacy and cases concerning it do not open an "impermissible analytical gap" between Dr. Lobatz's causation opinions and the evidence upon which they are premised. *Bitler v. A.O. Smith Corp*., 400 F.3d 1227, 1233 (10th Cir. 2005) (citation omitted). As such, exclusion of Dr. Lobatz's opinions on reliability grounds is improper. *See In re Urethane*, 768 F.3d at 1263 ("[A] district court must admit expert testimony as long as it is based on a reliable methodology.").

### 2. *Experience*

Dr. Munir next argues that Dr. Lobatz's opinions are "supported solely" by his professional experience, and for this reason must be excluded (ECF No. 61 at 17). Plaintiffs contend that, as an expert, Dr. Lobatz may rely on his professional experience in forming his causation opinions,

and—given his years of experience and "careful[] explanation" of Ms. Banks's case—his opinions are admissible (ECF No. 74 at 18–19). The Court agrees with Plaintiffs.

"An expert witness's testimony can rely solely on experience. When that is the case, however, the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Nacchio*, 555 F.3d at 1258 (quotations omitted); *see also* Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."); *Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Moreover, although courts "cannot accept "the *ipse dixit* of [an] expert . . . . "[t]rained experts commonly extrapolate from existing data." *Joiner*, 522 U.S. at 144.

Dr. Lobatz is a neurologist with over forty years of neurology and neuro-rehabilitation experience (ECF No. 61-3 at 1). In opining that Ms. Banks would have "more likely than not" have had a positive outcome had tPA been administered, Dr. Lobatz did more than "simply reference[] his experience in general rather than providing any meaningful explanation as to how he reached his conclusions." *See Ho v. Michelin N. Am., Inc*., 520 F. App'x 658, 664–65 (10th Cir. 2013). For instance, Dr. Lobatz testified that his conclusion was also based on evidence related to tPA's administration in geriatric populations and Ms. Bank's comparative youth (ECF No. 61-1 at 7). He further opined that Ms. Banks would have more likely than not benefited from tPA's

administration because she suffered a small vessel occlusion and "[did] not fall within the subgroups of the literature where [tPA] has a lower probability of a good outcome" (ECF No. 61-3 at 82). And, contrary to Dr. Munir's argument, Dr. Lobatz's failure to explicitly cite any control group studies or work in discussing his experience with tPA's efficacy and administration during his deposition does not render his opinions unreliable. *See, e.g., Salazar v. United States*, No. 20-CV-941-SWS/MLC, 2021 WL 6808324, at *2 (D.N.M. Dec. 30, 2021) ("Based on [a doctor's] education, training, and *experience* in emergency medicine, including the care of stroke patients, he [was] sufficiently qualified to opine on the likely benefit that timely treatment with tPA would have had in [the plaintiff's] case." (emphasis added)); *Kumho Tire*, 526 U.S. at 156.

In sum, there is no "self-contained analytical gap" in Dr. Lobatz's causation opinions and the professional experience—coupled with other evidence and data—upon which they are based, and Dr. Munir's arguments to the contrary are unavailing. *Roe*, 42 F.4th at 1182; Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments. *Cf. Roe*, 42 F.4th at 1182 ("Without this testing or *additional explanation*, it is totally unsupported why the experts believe the shifter could shift on its own into reverse after remaining in false park for sufficient time." (emphasis added)); *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Mountain v. United States*, No. 19-CV-005-J, 2020 WL 8571674, at *7 (D. Wyo. Sept. 11, 2020) (concluding that case was "not a circumstance where the experts should be struck on the basis of *Daubert* [because] [a]ll the medical causation experts are relying upon their expertise and on the type of information generally relied upon by medical care providers," and denying the defendant's motion to strike Dr. Lobatz's expert testimony). Dr. Lobatz, relying on his experience, sufficiently explained how that

experience led to his conclusion regarding Ms. Banks's injuries as well as how his experience—coupled with other scientific data—formed a sufficient basis for his opinions, and the Court finds that his experience may be reliably applied to the facts of this case. *Nacchio*, 555 F.3d at 1258.

### 3.  Relevance & Helpfulness

Dr. Munir argues that Dr. Lobatz's opinions should be excluded because they are "irrelevant and unhelpful" (ECF No. 61 at 19). Because Plaintiffs must show that Dr. Munir's conduct was the "but-for" cause of Ms. Banks's harm under Colorado law, Dr. Munir's argument goes, Dr. Lobatz's opinions that she would have "more likely than not" benefited from tPA's administration should be excluded (*id.* at 19–20). Plaintiffs urge admission of Dr. Lobatz's opinions on relevance grounds, contending that his opinions are helpful under the applicable legal framework (ECF No. 74 at 20–21). The Court agrees with Plaintiffs.

In assessing an expert's opinions—the second step in fulfilling its "*Daubert* obligations"—a trial court must also query whether those opinions are "sufficiently relevant to the task at hand." *Bitler*, 400 F.3d at 1234. This "relevance" inquiry involves "look[ing] at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact." *Id.*; *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 n.2 (10th Cir. 2005) ("Under the relevance prong of the *Daubert* analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case." (citation omitted)). *Cf. United States v. Wofford*, 766 F. App'x 576, 581 (10th Cir. 2019) ("Relevance is about whether the expert testimony will assist the trier of fact or whether it instead falls within the juror's common knowledge and experience and will usurp the juror's role of evaluating a witness's credibility." (quotations omitted)). Fundamentally, the

relevance inquiry "encompasses Rule 702's requirement that the evidence '[help] the trier of fact to understand the evidence or to determine a fact in issue,'" and for this reason is "also referred to as helpfulness." *Delsa Brooke Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1172 (10th Cir. 2020) (quoting *Daubert*, 509 U.S. at 591).

It follows that, in assessing the relevance of an expert's opinion, courts turn to the case's disputed facts and the substantive law's material aspects. *See, e.g., Norris*, 397 F.3d at 884 n.2; *Daubert*, 509 U.S. at 591. Under Colorado law, "but-for" causation is the essential causation standard. *See, e.g., Vititoe v. Rocky Mountain Pavement Maint., Inc.*, 412 P.3d 767, 777 (Colo. App. 2015) ("The test for causation is the 'but for' test—whether, but for the alleged negligence, the harm would not have occurred." (quotations omitted)); *see also Lorenzen*, 457 P.3d at 105 ("[T]he 'substantial factor' and but-for standards of causation are not alternatives; but-for causation is a prerequisite to establishing the substantial factor test." (citing *June v. Union Carbide Corp.*, 577 F.3d 1234, 1241 (10th Cir. 2009)); *Banks v. Munir*, No. 1:20-cv-03729-DDD-KMT, 2021 WL 3728101, at *2 (D. Colo. June 9, 2021) ("[I]n general factual causation requires proof that defendant's negligence was the 'but for' cause of plaintiff's harm: 'whether, but for the alleged negligence, the harm would not have occurred.'" (citation omitted)). The "but-for" test is "satisfied if the negligent conduct in a 'natural and continued sequence, unbroken by any efficient, intervening cause, produce[d] the result complained of, and without which the result would not have occurred.'" *Vititoe*, 412 P.3d at 777 (quoting *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 985 (Colo. App. 2011)).

Citing this line of cases and the Court's dismissal order, Dr. Munir contends that Dr. Lobatz's causations opinions are irrelevant and unhelpful because they do not sufficiently address

17

the question of whether the failure to administer tPA was the "but-for" cause of Ms. Banks's injury (*see* ECF No. 61 at 19–20).[6] Not so. The pertinent inquiry is whether Dr. Lobatz's opinions would "logically advance" a material aspect of the case—namely whether the failure to administer tPA was a cause of Ms. Banks's injury—and assist the factfinder in doing so. *Norris*, 397 F.3d at 884 n.2; *see also Delsa*, 976 F.3d at 1172. They would. For instance, Dr. Lobatz testified not merely that Ms. Banks would have "more likely than not" benefited from tPA's administration, but that she would have gotten "*possibly even normal*" (ECF No. 61-1 at 6 (emphasis added); *see also id.* at 7). This testimony is consistent with his expert report, in which Dr. Lobatz opined: "[I]t is more likely than not that her recovery would have been significant, *if not near baseline*" (ECF No. 61-3 at 82 (emphasis added)). Accordingly, reading Dr. Lobatz's testimony and report in their entirety, his opinions—contrary to Dr. Munir's characterization—go beyond simply suggesting that had tPA been administered Ms. Banks's would have enjoyed a "substantial opportunity for a better outcome" (ECF No. 61 at 20). Dr. Lobatz's opinions involve complex scientific data and methods that concern a material aspect of this case—causation—and would sufficiently assist the factfinder in determining the but-for cause of Ms. Banks's injury. *See, e.g., Delsa*, 976 F.3d at 1172–73. This satisfies the Court's relevance inquiry. *See Daubert*, 509 U.S. at 591 ("Rule 702 further requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue . . . . Expert testimony which does not *relate* to any issue in the case is not relevant and, ergo, non-helpful." (quotations omitted) (emphasis added)).

* * *

---

[6] Recall that, in its June 2021 dismissal order, the Court dismissed Plaintiffs' medical negligence claim to the extent it was premised on a "loss-of-chance theory of negligence," not the *entirety* of their medical negligence claim (ECF No. 30 at 3). *See also id.* ("]C]ourts routinely dismiss aspects of claims that are not permissible [and] *June* squarely closes the door for Plaintiffs' loss-of-chance [negligence] theory.").

The Court may admit expert testimony in its discretion. *See, e.g., Joiner*, 522 U.S. at 136. Exercise of that discretion is appropriate here. Dr. Lobatz's opinions are reliable and relevant. And to the extent they are premised on his forty years of professional experience, this does not render his opinions inadmissible. *See, e.g., Nacchio*, 555 F.3d at 1258. Given the reliability and relevance of Dr. Lobatz's opinions, it is "for the [factfinder] to evaluate the reliability of the[ir] underlying data, assumptions, and conclusions." *In re Urethane*, 768 F.3d at 1263; *Joiner*, 522 U.S. at 155 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district judge to reject an expert's conclusions and keep them from the jury when they fit the facts of the case and are based on reliable scientific methodology." (Stevens, J., concurring)). Accordingly, and for the reasons set forth above, Dr. Munir's exclusion motion is denied.

### B. Summary Judgment Motion

Dr. Munir argues that Plaintiffs have no competent causation evidence, and therefore summary judgment is appropriate (ECF No. 62 at 5). Plaintiffs contend that, because Dr. Lobatz's causation opinions are admissible, his testimony "creates a question of fact for the [factfinder] on causation," and for this reason summary judgment is improper (ECF No. 75 at 7). The Court agrees with Plaintiffs.

For purposes of its summary judgment analysis, the following facts are undisputed. After suffering a stroke, Ms. Banks was seen by Dr. Munir via telemedicine on January 5, 2019 (ECF Nos. 62 at 2, 75 at 2). Ms. Banks did not receive tPA (*id.*). Plaintiffs allege that Dr. Munir is responsible for Ms. Banks's failure to receive tPA, and that its timely administration would have mitigated her severe stroke symptoms and complications (ECF Nos. 62 at 2, 75 at 3). Plaintiffs designated Dr. Lobatz as a causation expert (*id.*).

Summary judgment is warranted when (1) the movant shows that there is no genuine dispute as to any material fact and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 256 (1986). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial." *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).

Dr. Munir's summary judgment argument hinges on the exclusion of Dr. Lobatz's causation opinions (*see* ECF No. 62 at 5). However, as explained in the Court's discussion of Dr. Munir's exclusion motion, Dr. Lobatz's opinions are admissible. Therefore, because Dr. Lobatz's causation opinions are admissible, the Court agrees with Plaintiffs that summary judgment is improper (*see* ECF No. 75 at 7). *See also* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 251–52.[7]

---

[7] In their Response, Plaintiffs invite the Court to revisit its causation determinations in the June 2021 dismissal order (*see* ECF No. 75 at 6–7). The Court, for the reasons set forth in Dr. Munir's Reply, declines Plaintiffs' invitation (*see* ECF No. 83 at 3–4).

### III. CONCLUSION

Consistent with the above analysis, Dr. Munir's Motion to Exclude Plaintiffs Michele M. Banks and Kevin Banks's Expert Causation Opinions and Motion for Summary Judgment are DENIED (ECF Nos. 61 and 62).

DATED this 12th day of April 2023.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge